IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>TREON C. JACKSON, )<br>)<br>Defendant. )<br>) | Case No. 3:21-cr-81<br>Hon. David J. Novak |

### UNITED STATES' RESPONSE TO DEFENDANT'S
### NOTICE OF INSANITY DEFENSE PURSUANT TO FED. R. CRIM. P. 12.2(A)

The United States of America, by undersigned counsel, respectfully submits its Response to Defendant's Notice of Insanity Defense Pursuant to Rule 12.2(a) of the Federal Rules of Criminal Procedure (ECF. No. 76), filed on April 14, 2023. The psychological assessment of Dr. Edward A. Peck III, PhD, ABPP-CN of the defendant and recorded jail calls of the defendant talking about the carjacking offense undermine any defense that the defendant, Treon Jackson, was insane at the time of the offense.

### BACKGROUND

1. On April 13, 2021, shortly after 1:00 p.m., a 911 call was made reporting that a white Chevrolet truck had been carjacked at gunpoint from the area of East 15th Street in Richmond, Virginia. Approximately 30 minutes later, another individual called 911 to report that her blue Chevrolet Equinox had been carjacked at gunpoint from the caller while in the parking lot of a Chipotle restaurant in Chester, Virginia. Before carjacking the blue Chevrolet Equinox from the female, the gunman was observed exiting a white Chevrolet truck, which had been

parked next to the blue Chevrolet Equinox in the same parking lot of the Chipotle restaurant. This white Chevrolet truck was confirmed as the same one that had been carjacked half an hour earlier.

2.   At approximately 2:00 p.m., members of the Petersburg Bureau of Police apprehended the defendant, Treon C. Jackson, while he was in the carjacked Chevrolet Equinox, after law enforcement remotely disabled the vehicle via OnStar. Recovered from the car were the keys to the white Chevrolet truck that had been carjacked in Richmond, cell phones identified as belonging to the defendant, and a loaded firearm with an extended magazine.

3.   On July 21, 2021, a grand jury sitting in the Eastern District of Virginia charged the defendant in a five-count Indictment with: Carjacking, in violation of 18 U.S.C. § 2119(1) (Counts 1 and 3); Possessing and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c) (Counts 2 and 4); and Possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count 5). ECF No. 4. The United States thereafter filed an amended indictment to correct a typographical error. ECF No. 22.

4.   On September 21, 2021, the Court held a detention hearing. ECF No. 14. The defendant was ordered detained without bond. *Id*. During a November 1, 2021 status hearing with this Court, the defense advised that JACKSON wished to proceed to trial. The Court scheduled jury selection to begin on December 6, 2021, and the trial to begin immediately thereafter on December 7 and 8, 2021. ECF. No. 26.

5.   On November 12, 2021, the defense filed a motion to continue the jury trial, previewing concerns regarding the defendant's competency to stand trial. ECF No. 26. Based on the defense's representations about the defendant's mental health, the Court ordered a

competency evaluation on November 16, 2021 to be conducted by Dr. Evan S. Nelson.  ECF No. 35.

6. Dr. Nelson reported that at the interview, "the defendant intentionally ducked questions about the facts of the case. . . Mr. Jackson initially claimed he could not remember anything. . .Ultimately, he would not tell his side with any detail." Nelson Eval. at 8.  Dr. Nelson based his report entirely on: (1) the Court Order regarding competency; (2) the Indictment, Amended Indictment, and Criminal Complaint; (3) the video of the defendant's statement's to law enforcement; and (4) interviews of the defendant, Treon Jackson, and his mother, Tonia Jackson. *Id.* at 1.  The Dr. Nelson's report did not reflect that Dr. Nelson performed standardized psychological assessments on the defendant.  While noting the defendant's evasiveness in participating in the interview, Dr. Nelson found that the defendant lacked competency to proceed. The defense-retained expert, Dr. Jonathan DeRight, similarly found the defendant lacking mental competence.

7. At the competency hearing on January 19, 2022, the Court concluded that the defendant "presently suffers from a mental defect that renders him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." ECF No. 46.

8. After completing competency restoration at FMC Butner, the defendant again appeared before the Court on January 6, 2023 and was found competent to proceed to trial.  At the same hearing, after the defense previewed its need to further assess the defendant's mental health, the Court set a schedule for further mental health-related briefing.  ECF No. 71.

9. Thereafter, on April 14, 2023, the defendant filed a notice of a defense of insanity

3

at the time of the offense pursuant to Fed. R. Crim. P. 12.2(a).  ECF No. 76.  The notice was "based on Dr. DeRight's competency evaluation dated January 12, 2022 and Dr. Nelson's competency evaluation dated December 13, 2021 (both filed under seal), together with the additional testing of Mr. Jackson conducted by Dr. DeRight on March 17, 2023." *Id.* at 3.

## ARGUMENT

10. The government's evidence at trial will reflect that the defendant was not insane at the time of the offense and that he has malingered illness for strategic benefit in this litigation.

*Evaluation of the defendant by Dr. Edward A. Peck III, PhD, ABPP-CN*

11. Pursuant to this Court's order, on or about March 21, 2023, Dr. Peck performed a neuropsychological evaluation of the defendant.  To form his assessments in this case, Dr. Peck reviewed: (1) documents from the Court's docket in this case; (2) the psychological reports of Dr. Evan Nelson, Dr. Evan Du Bois of FMC Butner, and Dr. Jonathan DeRight; (3) the interview of the defendant with law enforcement after he was apprehend on or about April 13, 2021; and (4) telephone calls between the defendant and other parties while the defendant was incarcerated.

12. Based on the evidence available to date, Dr. Peck is prepared to testify that at or around the time of the offense, the defendant did not show evidence of severe mental disease or defect such that he was unable to appreciate the nature, quality, and wrongfulness of his actions. On the contrary, Dr. Peck is prepared to testify that the pattern of spoken conversations of the defendant, both in Dr. Peck's interview of the defendant and as evinced in the defendant's communications subsequent to arrest, are inconsistent with indicia of severe mental disease or defect such that the defendant was unable to appreciate the nature, quality, and wrongfulness of his actions.

13. Dr. Peck further evaluated the defendant for malingering illness with respect to the criminal charges at hand, finding that the defendant is likely malingering illness. This assessment is based in part on standardized psychological assessments, to wit: The defendant's consistent passing level performance on standardized cognitive measures of statistical test performance validity, contrasted with consistent statistical failure on measures of mental health symptom validity. As another example, the defendant also demonstrated an elevated score on the Structured Inventory of Malingered Symptomology. The assessment is further based on some of the specific recorded telephone calls of the defendant, as detailed below.

*Recorded Jail Calls of the Defendant*

14. The validity of the insanity defense is belied by the defendant's own words over recorded jail calls.[1]

15. The defendant's own communications near the time of his arrest reflect an understanding that mental health could be strategically employed for advantage. For instance, on April 20, 2021, within a week of the offense, the defendant conversed with and individual named M.J. In that conversation, the defendant stated, "Yeah alright well I go to Tucker's maybe that will get me up out this bitch, but I ain't crazy, I know that, I know that."[2]

16. In a separate phone call on July 14, 2021, the defendant further stated, "At the end of the day, I know I ain't need to go to no fucking Tucker's or none of that." The defendant again acknowledged the strategic benefit of an assertion of mental health problems in a January 6, 2023 phone call. When told, "At the end of the day going to a hospital is better than going to jail," the

---

[1] The government is prepared to play the relevant jail call excerpts at the hearing.
[2] Tuckers is a psychiatric clinic providing mental health services in Richmond, Virginia.

defendant responded, "I know that 'cause the doctors determine when I get released."

17. It is worth noting also that the defendant provided an explanation of his motivation for committing the carjacking – he ran out of gas. On April 16, 2021, three days after his arrest, the defendant told his mother that his own car was parked on "15th and Maury," near the location of the first carjacking. The defendant's mother asked, "Why you down there," and Jackson responded, "Cause that's where I ran out of gas at." On April 20, 2021, the defendant stated in a different conversation, "I was down there on 95 north ramp towards Petersburg. . . I took them people on a high-speed chase from the house, your house. . . I was literally coming to see [defendant's children], my car ran out of gas, I had money but wasn't at a gas station. One thing led to another, I was going to complete my mission. You dig. . .I was going to complete it."

18. On April 18, 2021, within a week of his arrest, the defendant expressed an acknowledgement of the risk of detection inherent with stealing cars. The defendant intimated that he had stolen cars "when I was younger, but shit played out. . .I think I got out when the technology got too new [because] aint no way you can take a car and them people be on you in an hour." The defendant continued, "Onstar, that's what that shit was. . .[t]hat's what I meant by the technology, but it is what it is."

19. Lastly, by the defendant's own admission on these phone calls, he knew of the wrongfulness of his misdeeds **at the time of the offense**. In a conversation on July 18, 2021 with an individual named L.B., discussing his encounter with law enforcement that led to his arrest, the defendant conversed as follows:

> Defendant: "That's what they did to me, they snatched my ass up out that truck and slammed me to the fucking ground so hard."
>
> L.B.: "You shouldn't have been in the fucking truck."

6

Defendant: "Everyday I wake up in this bitch I be mad at myself **because I knew better**."

20. Taken together, the defendant's own words in the jail calls undermine the defense of insanity at the time of the offense.

## CONCLUSION

The defense of insanity is belied by indicia of the defendant malingering illness, both throughout his psychological evaluations and through the defendant's own recorded conversations about the strategic benefits of "going to Tucker's" even though he "ain't crazy." Moreover, the evaluation of Dr. Edward Peck and the defendant's recorded conversations about the carjacking incident reinforce that the defendant was not insane when he committed the offense.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY


By: _____/s/_____.
Avi Panth
Virginia Bar No. 92450
Angela Mastandrea-Miller
Virginia Bar No. 51070
Assistant United States Attorneys
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: avishek.panth@usdoj.gov
angela.miller3@usdoj.gov